No. 26-2695

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

BERNADETTE MATTHEWS, in her official capacity as Executive Director of the State Board of Elections for the State of Illinois,

Defendant-Appellee

and

COMMON CAUSE, BRIAN BEALS, ILLINOIS ALLIANCE FOR RETIRED AMERICANS, et al.,

Intervening Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
Dist. Ct. No. 3:25-cv-03398-CRL-DJQ
The Honorable Judge Colleen R. Lawless

# BRIEF FOR THE UNITED STATES AS APPELLANT

*(see inside cover for Counsel)*

*(continuation of Counsel)*


HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

DAVID N. GOLDMAN
ANDREW G. BRANIFF
KELSEY E. MCGEE
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 251-0053

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 2

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

SUMMARY OF ARGUMENT .......... 12

STANDARD OF REVIEW .......... 14

ARGUMENT

I. The DOJ is entitled to Illinois's SVRL under the CRA. .......... 14

A. Illinois's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand. .......... 16

1. The SVRL is a record that came into Director Matthews's possession. .......... 17

2. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with other federal voting laws. .......... 27

B. The DOJ stated a sufficient basis and purpose in its demand for Illinois's SVRL. .......... 31

1. Courts play a limited role in assessing the Attorney General's demand under Title III. .......... 32

**TABLE OF CONTENTS (continued): PAGE**


2. The DOJ's demand stated an adequate basis. .......... 42

3. The DOJ's stated purpose of ascertaining Illinois's compliance with the NVRA and HAVA was sufficient. .......... 46

4. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303. .......... 50

II. The DOJ's demand for Illinois's unredacted SVRL does not implicate or violate state or federal privacy laws. .......... 52

A. Federal law preempts any contrary Illinois privacy law. .......... 53

B. The United States is complying with the Privacy Act. .......... 57

C. The E-Government Act does not prevent the DOJ from obtaining Illinois's SVRL. .......... 60

D. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining Illinois's SVRL. .......... 64

CONCLUSION .......... 65

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

**TABLE OF CONTENTS (continued):**

CERTIFICATE OF SERVICE

SHORT APPENDIX

## TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961) .......... 32

*American Oversight v. United States Dep't of Just.*, 45 F.4th 579 (2d Cir. 2022) .......... 59

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .......... 53

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 14

*Big Ridge, Inc. v. Federal Mine Safety and Health Rev. Com'n*, 715 F.3d 631 (7th Cir. 2013) .......... 38

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .......... 49, 60

*Bryan v. United States*, 524 U.S. 184 (1998) .......... 29

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .......... 54

*Chaidez v. Ford Motor Co.*, 937 F.3d 998 (7th Cir. 2019) .......... 14

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (per curiam) .......... 34, 44

*Dean v. United States*, 556 U.S. 568 (2009) .......... 47

*Donaldson v. United States*, 400 U.S. 517 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat.1520 .......... 34-35

*Doe v. Chao*, 540 U.S. 614 (2004) .......... 58

**CASES (continued):** **PAGE**

*Dow Chem. Co. v. Allen*, 672 F.2d 1262 (7th Cir. 1982) ............ 37, 40, 51

*EEOC v. Sidley Austin Brown & Wood*,
315 F.3d 696 (7th Cir. 2002) ........................................................ 41

*EEOC v. South Carolina Nat'l Bank*,
562 F.2d 329 (4th Cir. 1977) ........................................................ 41

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.*,
356 F. Supp. 3d 85 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019) ........................ 62-63

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) ........................ 41

*Ex Parte Siebold*, 100 U.S. 371 (1879) .................................................. 54

*Fischer v. United States*, 603 U.S. 480 (2024) ........................................ 28

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) ............... 18

*Foster v. Love*, 522 U.S. 67 (1997) ........................................................ 54

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) ..... 19

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771 (2023) ........................................ 55

*Gray v. Main*, 309 F. Supp. 207 (M.D. Ala. 1968) .................................. 55

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ......................... 16, 47

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ..................................... 32

*Kennedy v. Lewis*, 325 F.2d 210 (5th Cir. 1963) (per curiam) ..........22-23

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .............................. *passim*

**CASES (continued):** **PAGE**

*Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963) (per curiam) ................ 22

*Khan v. United States*, 548 F.3d 549 (7th Cir. 2008) ............................. 37

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ............ 16

*Link v. NLRB*, 330 F.2d 437 (4th Cir. 1964).......................................... 42

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................ 44

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ......................... 16

*Neitzke v. Williams*, 490 U.S. 319 (1989) ............................................... 44

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) .................................................................. 16, 47

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946) .................... 38

*Public Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ......................................................... 56

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)............................... 50

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ....................................................................... 29

*Reno v. Condon*, 528 U.S. 141 (2000) ....................................................... 64

*Reynolds v. Sims*, 377 U.S. 533 (1964).................................................... 50

*Russello v. United States*, 464 U.S. 16 (1983)......................................... 48

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ............................4-5

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012)...................... 63

**CASES (continued):** **PAGE**

*Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992) .................................. 44

*United States v. American Target Advert., Inc.*,
257 F.3d 348 (4th Cir. 2001) ........................................................ 50

*United States v. Benson*,
819 F. Supp. 3d 753 (W.D. Mich.),
*aff'd*, 179 F.4th 470, *reh'g en banc denied*,
187 F.4th 462 (6th Cir. 2026)........................................... 18, 50, 57

*United States v. Duke*, 332 F.2d 759 (5th Cir. 1964) .............................. 55

*United States v. Insurance Consultants of Knox, Inc.*,
187 F.3d 755 (7th Cir. 1999) ........................................................ 37

*United States v. LaSalle Nat'l Bank*, 437 U.S. 298 (1978) ..................... 51

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ........................ 34, 45

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) ....................... 53

*United States v. Mississippi*, 229 F. Supp. 925
(S.D. Miss. 1964), *rev'd*, 380 U.S. 128 (1965)................................ 55

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .......................... 40

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026),
*appeal pending*, No. 26-1231 (9th Cir.)......................................... 46

*United States v. Powell*, 379 U.S. 48 (1964).................................. *passim*

*United States v. Stuart*, 489 U.S. 353 (1989)......................................... 51

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ........................................................................ 21

**CASES (continued):** **PAGE**

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025)....27

*Walsh v. Alight Sols. LLC*, 44 F.4th 716 (7th Cir. 2022)....40

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1....54

U.S. Const. Art. VI, Cl. 1....53

**STATUTES:**

Civil Rights Act of 1960 (CRA)
52 U.S.C. 10101....47
52 U.S.C. 20701 *et seq.*....4
52 U.S.C. 20701-20706....47
52 U.S.C. 20702....57
52 U.S.C. 20703....*passim*
52 U.S.C. 20704....5, 55
52 U.S.C. 20705....5, 15
Pub. L. No. 86-449, § 601, 74 Stat. 90....47

Civil Rights Cold Case Records Collection Act of 2018
Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019)....20

Driver's Privacy Protection Act of 1994 (DPPA)
18 U.S.C. 2721 *et seq.*....64
18 U.S.C. 2721(a)....64
18 U.S.C. 2721(b)(1) (1994 ed. Supp. III)....65
18 U.S.C. 2721(c)....64-65
18 U.S.C. 2725(1)....64

E-Government Act of 2002
§ 201....61-62
§ 208(b)(1)(A)(ii)....62, 64

**STATUTES (continued):** **PAGE**

§ 208(b)(1)(A)(ii)(II) .................... 61
§ 208(b)(1)(B)(i).................... 61
44 U.S.C. 3601 .................... 61
Pub. L. No. 107-347, 116 Stat. 2899 .................... 61

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 21083(a).................... 63
52 U.S.C. 21083(a)(1)(A) .................... 6, 63
52 U.S.C. 21083(a)(1)(A)(i).................... 17, 30
52 U.S.C. 21083(a)(1)(A)(vi) .................... 30
52 U.S.C. 21083(a)(1)(A)(viii).................... 30
52 U.S.C. 21083(a)(2)(A) .................... 6
52 U.S.C. 21083(a)(5)(A)(i)-(ii) .................... 6
52 U.S.C. 21083(a)(5)(A)(iii).................... 6
52 U.S.C. 21083(a)(2)(B) .................... 6
52 U.S.C. 21111 .................... 65
Pub. L. No. 107-252, 116 Stat. 1666 .................... 49

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501(a)(3) .................... 49
52 U.S.C. 20501(b)(3) .................... 5
52 U.S.C. 20507(a)(4)(A)-(B) .................... 5
52 U.S.C. 20507(i)(1) .................... 5
52 U.S.C. 20510(a).................... 65

President John F. Kennedy Assassination
Records Collection Act of 1992
Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 .................... 20

Privacy Act of 1974
5 U.S.C. 552a(e)(4) .................... 58
5 U.S.C. 552a(e)(4)(B) .................... 59
5 U.S.C. 552a(e)(7) .................... 57
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896.................... 58

**STATUTES (continued):** **PAGE**

10 U.S.C. 130c(d)(2)(C) ........ 22

13 U.S.C. 214 ........ 22

26 U.S.C. 7602 (1954 ed.) ........ 37

26 U.S.C. 7605(a) ........ 38

26 U.S.C. 7605(b) ........ 38

28 U.S.C. 1331 ........ 2

28 U.S.C. 1345 ........ 2

28 U.S.C. 1291 ........ 2

30 U.S.C. 1732(b) ........ 22

31 U.S.C. 5314(a) ........ 61

44 U.S.C. 2107 ........ 20

44 U.S.C. 3501 ........ 61

44 U.S.C. 3502 ........ 63

44 U.S.C. 3502(3)(A)(i) ........ 61

44 U.S.C. 3502(3)(B) ........ 62

44 U.S.C. 3502(10) ........ 61

44 U.S.C. 3518(c)(1)(B) ........ 62

44 U.S.C. 3572(f) ........ 22

**LEGISLATIVE HISTORY:** **PAGE**

*Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) ............................... 39

H.R. Rep. No. 956, 86th Cong., 2d Sess. (1959) ....................................... 23

**RULES:**

Fed. R. App. P. 2 ............................................................................ 66

Fed. R. App. P. 41(b) ........................................................................ 66

Fed. R. App. P. 40(d)(1) .................................................................... 66

Fed. R. Evid. 201(b) .......................................................................... 52

**REGULATIONS:**

28 C.F.R. 0.50(a) .............................................................................. 59

68 Fed. Reg. 47,610 (Aug. 11, 2003) ..................................................... 58

68 Fed. Reg. 47,611 (Aug. 11, 2003) ..................................................... 59

70 Fed. Reg. 43,904 (July 29, 2005) ...................................................... 58

82 Fed. Reg. 24,147 (May 25, 2017) ...................................................... 58

**MISCELLANEOUS:**

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (2026), https://www.justice.gov/olc/media/1440346/dl ......................... 19, 62

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) .................................................................. 63

**MISCELLANEOUS (continued):** **PAGE**


Report of the United States Commission on Civil Rights (1959) https://www.usccr.gov/files/historical/1959/59-001-U.pdf ............ 24

*The American College Dictionary* (1959 ed.) ............ 19, 27

*The American Heritage College Dictionary* (4th ed. 2002) ............ 63

*The New Shorter Oxford English Dictionary* (4th ed. 1993) ............ 19

U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited September 28, 2026) ............ 59

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury# ............ 60

U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/Help AmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf (last visited Sept. 22, 2026) ............ 49

*Webster's New World Dictionary of the American Language* (8th coll. ed. 1960) ............ 18

*Webster's Third New International Dictionary* (1966 ed. unabridg.) ............ 20, 27

## INTRODUCTION

The individual weight of every vote in the United States is critical to confidence in federal elections. The American people deserve elections they can trust. Accurate voter rolls are essential to that trust in the process and confidence in the outcome. As with its efforts nationwide, the Department of Justice (DOJ) seeks to obtain Illinois's statewide voter registration list (SVRL) to ensure that its federal elections are deserving of such trust. In so doing, DOJ is not doing anything extraordinary. DOJ's request for the State's SVRL is a lawful exercise of its authority under Title III of the Civil Rights Act of 1960 (CRA), and it is made for the lawful purpose of ensuring the State's compliance with the list-maintenance requirements of the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA).

The district court erred in dismissing the case and denying the United States' motion to compel Illinois's SVRL on the ground that an SVRL is not a record covered by Title III. The district court added atextual limitations to the relevant statutory provisions, 52 U.S.C. 20701 and 20703, concluding that election officials are only required to preserve records that come into their possession from outside sources. Similarly,

the district court erred in holding that the CRA is not an appropriate mechanism to investigate NVRA and HAVA compliance and that the Attorney General's written demand lacked a sufficient statement of basis and purpose. This court should reverse the dismissal order and remand with instructions directing the district court to compel Director Matthews to produce the unredacted version of Illinois's SVRL to the DOJ forthwith.

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1345. That court entered a final Order granting defendants' Motions to Dismiss on August 15, 2026. SA15.[1] The United States filed a timely Notice of Appeal on August 17, 2026. SA16. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

The Civil Rights Act of 1960 requires "[e]very officer of election" to "retain and preserve . . . all records and papers which come into his

[1] "Doc. __, at __" refers to the number of the document on the district court docket in this case and the corresponding page number. "Doc. 5-__, at ___" refers to the district court's document number 5 and ECF header pagination therein. "SA_" refers to the page number of the Short Appendix.

possession relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election" for a prescribed period after that election. 52 U.S.C. 20701. Upon proper demand from the Attorney General or his representative, any "person having custody, possession, or control of such record or paper" must make it "available for inspection, reproduction, and copying." 52 U.S.C. 20703.

The questions presented are:

1. Whether Illinois's SVRL is a record or paper that Title III of the CRA requires the State to retain and preserve and to produce upon the Attorney General's written demand.

2. Whether the DOJ adequately stated the basis and purpose for its demand for an electronic, unredacted copy of Illinois's SVRL under Title III of the Civil Rights Act.

3. Whether privacy laws permit Illinois to refuse the DOJ's demand for an electronic, unredacted copy of Illinois's SVRL.

## STATEMENT OF THE CASE

1. a. Title III of the Civil Rights Act (CRA) of 1960 is entitled "Federal Election Records." Pub. L. No. 86-449, § 301, 74 Stat. 86 (1960). It imposes a "sweeping" obligation on election officials to preserve and,

on request, to produce voter registration records pertaining to federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962).

The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). To that end, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Section 301 of Title III requires that

> [e]very officer of election . . . retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.

52 U.S.C. 20701.

The key provision at issue here, Section 303, authorizes the Attorney General or his representative to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying." 52 U.S.C. 20703. Such demand "shall contain a statement of the basis and the purpose therefor." *Ibid.*

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court, which may "compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the Civil Rights Act, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress since has enacted additional laws that affect the "records and papers" that are subject to disclosure. 52 U.S.C. 20701. Relevant here are the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA), which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3).

The NVRA's requirements include recordkeeping obligations, 52 U.S.C. 20507(i)(1), and the duty to make reasonable efforts to maintain lists of eligible voters that do not include the names of ineligible voters, 52 U.S.C. 20507(a)(4)(A)-(B). HAVA requires States to implement a

single centralized and computerized SVRL, and to engage in list maintenance on a regular basis by removing ineligible voters. 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A) & (B). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

2. On July 28, 2025, DOJ sent a letter to Director Matthews requesting "information regarding the State's procedures for complying with . . . the [NVRA]" as well as "[t]he current electronic copy of the State of [Illinois's] computerized [SVRL]" with "all fields contained within the list." Doc. 5-2, at 2. The letter included information from the Election Assistance Commission's Election Administration and Voting Survey (EAVS) that gave the DOJ cause for concern regarding Illinois's

compliance with its list-maintenance obligations under the NVRA and HAVA. *See* Doc. 5-2, at 2-4.

For example, in November 2024, 32 of 102 Illinois counties did not send voter registration confirmation notices. Doc. 5-2, at 3. Despite this, Illinois reported that it sent 3.8 million confirmation notices, comprising 46.9% of all registered voters. Doc. 5-2, at 3. This differed significantly from the national average of 19.5%. Doc. 5-2, at 3. Similarly confounding was EAVS data stating that 16 counties in Illinois reported sending confirmation notices to more than 100% of all registered voters, with alarming numbers in several counties:

- Jo Daviess County, 678.6%
- Christian County, 265%
- Alexander County, 239.3%
- Edwards County, 244.5%
- Washington County, 232.7%
- Saline County, 220.1%

Doc. 5-2, at 3. Illinois also reported that 2.3 million results of confirmation notices sent (or 62.3% of all confirmation notices) were "not categorized," while the national average was 17.8%. Doc. 5-2, at 3.

EAVS data also showed more than 25% percent of voters had "be[en] removed for a reason described as 'other'" in comparison to a "national average [of] 3.7 percent." Doc. 5-2, at 4. In some counties, the numbers were particularly high:

- Jefferson County, 99.4%
- Winnebago County, 87.3%
- Fulton County, 71.2%
- McLean County, 68.2%
- Cook County, 67.5%
- McHenry County, 65%
- Green County, 50.4%

Doc. 5-2, at 4.

On August 11, 2025, the Illinois State Board of Elections and Director Matthews responded to DOJ's letter by providing a contact list of Illinois election officials and a redacted copy of the Illinois SVRL. Doc. 42-1.

On August 14, 2025, the DOJ responded to Director Matthews by emphasizing that the Attorney General was requesting an SVRL with "*all fields*, including the registrant's full name, date of birth, residential

address, his or her state driver's license number or the last four digits of the registrant's social security number." Doc. 5-2, at 7. The letter also reiterated Illinois's obligations under the NVRA and emphasized that Title III of the Civil Rights Act of 1960 (CRA) gave the Attorney General authority to request Illinois's unredacted SVRL. Doc. 5-2 at 8.

On September 2, 2025, Director Matthews responded to DOJ. Doc. 5-2, at 11-14. Director Matthews opposed the demand, citing Illinois privacy laws and the federal Privacy Act. Doc. 5-2, at 11-14. The letter concluded by promising a forthcoming letter to directly answer the Attorney General's previous letters. Doc. 5-2, at 14. On September 10, 2025, the Illinois State Board of Elections sent a supplementary response to DOJ. Doc. 42-2, at 2-11. The letter maintained that Illinois complied with NVRA and HAVA obligations and would not produce the unredacted SVRL. Doc. 42-2, at 2-11.

3. On December 18, 2025, the United States filed a Complaint against Director Matthews and moved to compel the production of the unredacted SVRL. Doc. 1-2.[2] On December 22, 2025, Illinois AFL-CIO,

[2] The original pleadings were stricken by the court for procedural reasons and refiled as Doc. 4 (Complaint) and Doc. 5 (Motion to Compel).

Illinois Alliance for Retired Americans, and Illinois Federation of Teachers (collectively Ill. AFL-CIO) moved to intervene (Doc. 7) and were granted leave on March 2, 2026. Text Order Granting Leave to Intervene, (Mar. 2, 2026). On January 9, 2026, Brian Beals, Common Cause, Alejandra L. Ibanez, Illinois Coalition for Immigrant and Refugee Rights, and Pablo Mendoza (collectively Common Cause) moved to intervene (Doc. 24), and that motion was granted on March 2, 2026. Text Order Granting Leave to Intervene (Mar. 2, 2026).

Defendant Director Matthews filed a Motion to Dismiss on procedural grounds on February 20, 2026. Doc. 41.[3] On March 2, 2026, intervenors Ill. AFL-CIO answered United States' Complaint (Doc. 48), while Common Cause filed a Motion to Dismiss on the same date (Doc. 49). Ill. AFL-CIO later filed a Motion to Dismiss on March 12, 2026. Doc. 56. On March 17, 2026, Defendant Director Matthews filed a Motion to Dismiss for failure to state a claim and Opposition to the Motion to Compel on March 23, 2026. Doc. 64.

[3] Director Matthews initially argued that she was not properly served (Doc. 42, at 11) but later acknowledged (Doc. 65, at 11-12) that service was effectuated on March 2, 2026.

On July 31, 2026, the district court entered its judgment (SA15) and opinion (SA1-14), denying the United States' Motion to Compel and granting the Motions to Dismiss.

The district court first held that an SVRL is not a "record[] or paper[]" subject to Title III because it does not "come into [an election officer's] possession." SA6-9. According to the district court, "the phrase" "come into his possession" captures only documents that election officers receive "from outside sources" and not those "records that state election officials *create* or merely *possess*." SA7. Because the SVRL "is created by the Illinois Board of Elections and maintained internally" (*ibid.*), the district court reasoned that Title III does not apply. SA7. The district court also thought its ruling necessary in order to avoid a conflict between an election officer's duty under Title III to "retain and preserve" covered records, 52 U.S.C. 20701, and the ongoing obligation to update the SVRL under the NVRA and HAVA, 52 U.S.C. 20507, 21083. SA9.

The district court also concluded that the Attorney General's written demand lacked the necessary "statement of the basis and purpose therefor." 52 U.S.C. 20703; SA10-13. Refusing to look at the July 28 and August 14 letters together (SA10 n.4), the district court found that the

demand (which it viewed as the August 14 letter only) contained no "factual basis for the demand." SA12. It also believed that the DOJ's stated purpose—investigation into Illinois's compliance with its duties under the NVRA and HAVA—was a legally improper purpose because it did not "relate to a purpose of investigating violations of individuals' voting rights." SA13 (citation omitted).

On August 17, 2026, the United States appealed the district court's judgment. SA16.

## SUMMARY OF ARGUMENT

The district court erred in dismissing the United States' claim under Title III of the CRA. Under the plain language of Section 301 (52 U.S.C. 20701), Illinois's SVRL is a "record[] [or] paper[] which come[s] into [an election officer's] possession relating to any application[ or] registration," which must be preserved and produced to the Attorney General for inspection upon written demand. *See* 52 U.S.C. 20703. The district court erred in adopting a strained interpretation of "come[s] into . . . possession," 52 U.S.C. 20703, that arbitrarily excludes internally generated records like the SVRL from Title III's reach.

The district court also erred in finding that the Attorney General did not satisfy the basis and purpose requirement of Section 303 (52 U.S.C. 20703) when it issued a written demand to Director Matthews. Assuming that the demand must provide a "factual basis," the July 28 letter—which was part of the same correspondence as the August 14 letter—provided plenty, and no legal authority supports reviewing the August 14 letter in a vacuum. Regarding "purpose," Title III does not limit the Attorney General's demand authority to investigations into violations of individual's voting rights; even if it did, an investigation into NVRA and HAVA compliance would qualify.

While the district court declined to reach other arguments advanced below, none provides an alternative ground to affirm the district court. *First*, Title III does not authorize a court to scrutinize just how necessary the SVRL is to fulfill the Attorney General's stated purpose or whether that purpose is pretextual. *Second*, no state or federal privacy laws permit Illinois to withhold the full, unredacted SVRL from the Attorney General. This Court should remand this case with instructions to order Illinois to produce the full, unredacted SVRL for inspection consistent with the United States' Title III demand.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo and accepts "as true the complaint's well-pleaded allegations and drawing all reasonable inferences in the plaintiffs' favor." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

A motion to dismiss must be denied so long as the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679.

## ARGUMENT

### I. The DOJ is entitled to Illinois's SVRL under the CRA.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from

the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the State election officer has rejected it, the Attorney General may seek an order from a federal court "by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the United States' Title III claim on the ground that Illinois's SVRL is not a record or paper subject to the retention and preservation requirements of 52 U.S.C. 20701 because it did not "come into [an election officer's] possession," and thus was not subject to the Attorney General's demand under 52 U.S.C. 20703. SA7. This was error.

### A. Illinois's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand.

Illinois's SVRL comes within the scope of Title III's "sweeping" retention provision. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records"). In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). Title III's text supports a far broader investigative power than what the district court's reading allows.

Section 301 covers records "relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. 20701. The term "relating to" should be defined "expansively." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717-718 (2018). In Section 301, the phrase expands the type of records to be preserved beyond simply

applications, registrations, or receipts for payments. 52 U.S.C. 20701. Instead, any record "relating to" one of those activities—or even relating to the catchall "other act requisite to voting"—must be preserved. *Ibid.* The SVRL is not just a record that relates to voter registration, it is the preeminent and statutorily mandated record that governs all state voter registrations. 52 U.S.C. 21083(a)(1)(A)(i) ("The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.").

The district court erred in holding that Title III excludes self-generated records and that the NVRA and HAVA mandate alterations that would violate Title III were the SVRL within Title III's scope. SA6-9. The phrase "come into his possession" broadly covers records created by States and local governments and records obtained from outside sources. And updating the SVRL in compliance with the NVRA and HAVA does not alter the SVRL within the meaning of Title III.

#### 1. The SVRL is a record that came into Director Matthews's possession.

The district court erred in holding that records "created by" the State fall outside the scope of Title III because they do not "*come into* [the Board's] possession." SA7. The phrase "come into his possession" refers

to how and when possession began, 52 U.S.C. 20701; it does not exclude self-generated records. Any officer in possession of an SVRL came into possession at a distinct point in time.

While the district court below relied heavily on the Sixth Circuit panel decision in *United States v. Benson*, 179 F.4th 470, 478 (6th Cir. 2026) (*Benson II*), a majority of the Sixth Circuit recently expressed agreement with the United States that an SVRL is a record that "come[s] into [the] possession" of a State's chief election official. *United States v. Benson*, 187 F.4th 462, 465 (6th Cir. 2026) (*Benson III*) (Murphy, J., concurring in denial of reh'g en banc); *id.* at 472-473 (Griffin, J., dissenting); *id.* at 478-479 (Thapar, J., dissenting).

a. When a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining

"acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own."). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *The New Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The American College Dictionary* 11 (1959 ed.) (defining "acquire" similarly). The term "come into his possession" is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C., at 8-9 (2026), https://www.justice.gov/olc/media/1440346/dl.

Thus, contrary to the district court's conclusion, the word "come" cannot create a carve-out for self-generated documents. *See* SA8. If anything, Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and

*when* the officer gains possession of the records or documents in the first instance.[4] 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance").

A majority of the en banc Sixth Circuit recently acknowledged the possibility that the phrase "come into . . . possession" had developed a meaning contrary to defendants' interpretation here. *Benson III*, 187 F.4th at 465 (Murphy, J., concurring); *see also id.* at 470-471 (Griffin, J., dissenting); *id.* at 478-479 (Thapar, J., dissenting). It "was a familiar legal expression" at the time Congress enacted Title III, "regularly used . . . to describe when a person lawfully assumed possession of property through an office, employment, or other legal authority." *Id.* at 470 (Griffin, J., dissenting). But that phrase "did not distinguish property

[4] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) (referring to a record that "was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

according to its source," so "records that come into an official's possession could include self-created records." *Id.* at 470-471. In other words, "[t]he more natural inference is that . . . 'come into possession' [was] a familiar legal formulation identifying when the statutory duty attached, not . . . creating a separate substantive limitation on the records covered." *Id.* at 471. There is, in short, no external-source limitation to be found in the text of Title III. *Ibid.*; *Benson II*, 179 F.4th at 485 n.3, 486 n.7 (Nalbandian, J., dissenting).

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (citation and internal quotation marks omitted; emphasis added). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession

of material refers to when and how the possession began. *See id.* at 145-146.

Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

Moreover, decisions contemporaneous to the statute's passage confirm the point. *See Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (per curiam) (requiring the district court "to order each appellee to make available . . . all records and papers *in the possession*, custody or control of said appellee relating to any application, registration, payment of poll tax or other act requisite to voting" (emphasis added)); *Kennedy v. Lewis*,

325 F.2d 210, 212 (5th Cir. 1963) (per curiam) (requiring the district court to grant the same inspection rights); *see also* H.R. Rep. No. 956, 86th Cong., 2d Sess. 6, 37, 39 (1959) (explaining that Section 301 "would include *all records and papers* in the possession of election officers") (emphasis added). Placing an external-source limitation on Section 301 is an unnatural reading. Election officers in Illinois acquired records and information from individual voters in the course of carrying out their duties. When they aggregated those individual records into one new, single record—the SVRL—they acquired that new record and retained it within their control, thus coming into possession of the SVRL. *See Benson II*, 179 F.4th at 484 (Nalbandian, J., dissenting). The moment of the SVRL's creation is the relevant moment; after that moment, the creating officer possesses a new document that he or she previously did not possess. *See Tax Analysts*, 492 U.S. at 144-145.

b. Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities

required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf); *see also id.* at 475, 479 (majority opinion) (relying on the same report). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant." *Id.* at 486 (Nalbandian, J., dissenting) (citation omitted). These indices would be government-created records, but once an index was passed "up the ladder," the receiving "state official came into possession of the index." *Ibid.* The indices were critical evidence for the Commission because at least one state legislature had passed a bill permitting the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138.

And the Commission itself reviewed self-generated records, including overall voter registration lists for specific counties showing severe disparities in the registration rates of black and white citizens.

1959 CCR Report at 75, 82, 89. The Commission also gathered evidence of self-generated actions by county registrars, like error corrections on white voter registration applications. *Id.* at 87-88, 93. These county tally sheets and county voter registration lists have now been replaced by the electronic SVRL as required by HAVA.

In short, documents created by state agencies historically were some of the very types of records that the United States sought to investigate to weed out discrimination. The district court's reading would exclude from the reach of Sections 301 and 303 all the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

c. Even accepting an external-source limitation, though, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into the officer's possession, which would encompass the SVRL. *See* 52 U.S.C. 20701. A majority of the en banc Sixth Circuit recently agreed that Title III's "language imposes a specific duty on an individual (each officer of election), not a general duty on the entire State." *Benson III*, 187 F.4th at 465 (Murphy, J., concurring); *see*

*id.* at 473 (Griffin, J., dissenting); *id.* at 479 (Thapar, J., dissenting). That the fines and penalties follow the individual state official having possession of those records confirms the point. *See* 52 U.S.C. 20701.

"As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if *some* state officials created the SVRL—"and therefore didn't 'come into . . . possession' of the list themselves" under the district court's reading—Director Matthews "nonetheless 'c[a]me into . . . possession' of the [SVRL]" when she received it from other election officers. *Ibid.* (first brackets and ellipsis in original) (quoting 52 U.S.C. 20701).

In short, "[Director Matthews] 'came into possession' of the voter-registration list when she assumed office" or otherwise gained control of the SVRL. *Benson III*, 187 F.4th at 465 (Murphy, J., concurring). "[W]hen the [SVRL] comes under [Director Matthews's or the Board's] official custody and control through the actions of [her] subordinates, it comes into her possession." *Id.* at 473 (Griffin, J., dissenting); *see also id.* at 479 (Thapar, J., dissenting) (similar).

### 2. Treating the SVRL as a "record" or "paper" under Section 301 is consistent with other federal voting laws.

According to the district court, reading Title III to include the SVRL would put Title III's prohibition on altering records and the NVRA and HAVA's updating-and-modification requirements at odds with each other. SA9. That is incorrect. Reading Title III harmoniously with the NVRA and HAVA—which require continuous updates to the SVRL—yields the conclusion that an election officer properly "retain[s] and preserve[s]" an SVRL, 52 U.S.C. 20701, by updating it accurately as required by those statutes, *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and "constantly changing").[5] There is no obligation to create a

[5] *See The American College Dictionary* 1035 (1959 ed.) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 ed. unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

new, static version of the database with every single edit.[6] On this point, a majority of the Sixth Circuit's judges found Title III of the CRA could be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See Benson III*, 187 F.4th at 468 (Murphy, J., concurring); *id.* at 473-474 (Griffin, J., dissenting); *id.* at 479 n.7 (Thapar, J., dissenting).

At least three considerations show how Title III of the CRA can be harmonized with the NVRA and HAVA. First, the surrounding verbs elucidate the meaning of "alter" in this provision, which eliminates any conflict. *See Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *See id.* at 489-490 (describing a similar list of verbs). The SVRL is, as required by the NVRA and HAVA, an inherently evolving and changing record. List maintenance keeps the SVRL current; it does not "alter" it as that

[6] The CRA would, however, require election officials to preserve the official voter registration lists distributed to local election offices for the conduct of each specific federal election. 52 U.S.C. 20701.

term is used in Section 302.[7] *See Benson III*, 187 F.4th at 473-474 (Griffin, J., dissenting) ("'[A]lters' likewise refers to any minor tampering with or corruption of the document's integrity—not routine updates necessary to maintain an accurate voter list.").

Second, Section 302's prohibition on altering "record[s] or paper[s]" is accompanied by a mens rea requirement. The requirement that any penalizable alteration must be *willful* shows beyond all doubt that list maintenance under the NVRA and HAVA could never run afoul of the CRA's ban on altering records. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998) (citation omitted) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'").

And third, construing Title III to exclude the SVRL would contravene congressional intent by paralyzing the United States' ability to enforce various federal voting laws. The SVRL is not just *any* record

[7] Even if the statutes were truly inconsistent—and they are not—the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in Section 302. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). There is no basis for resorting to an "implied repeal" of Section 301 as applied to SVRLs. *Benson II*, 179 F.4th at 485-486 (Nalbandian, J., dissenting).

"requisite to voting," 52 U.S.C. 20701, in an election. It is the only federally mandated statewide record of voters required to conduct every election. HAVA states that "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii). The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State," 52 U.S.C. 21083(a)(1)(A)(i), and "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official," 52 U.S.C. 21083(a)(1)(A)(vi).

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, the Uniformed and Overseas Citizens Absentee Voting Act, the NVRA, HAVA, or the Voting Rights Act of 1965, for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that list maintenance efforts have been practiced ensuring that eligible voters are not being removed from SVRL and that ineligible

voters are not being included in the SVRL. *See Benson III*, 187 F.4th at 481 (Thapar, J., dissenting); *Lynd II*, 306 F.2d at 228.

The district court's perceived conflict between Section 302, on the one hand, and the NVRA and HAVA, on the other, would effectively carve out vast numbers of federal election records, including SVRLs, from the United States' inspection authority under Title III, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

### B. The DOJ stated a sufficient basis and purpose in its demand for Illinois's SVRL.

The Attorney General's demand for election records under Section 303 must "contain a statement of the basis and the purpose therefor." 52 U.S.C. 20703. According to the district court, the written demand in this case had no basis and a legally inadequate purpose. SA10-13. Courts have only a limited role in assessing a Title III demand, and here the Attorney General's demand complied with the statutory requirements.

A majority of Sixth Circuit judges agreed with the United States on this point: that DOJ satisfies the "basis" and "purpose" component of Title III in a written demand that "was based on 'Title III,'" described

"factual concerns with [the State's] voter-registration list[]," and "identified its purpose to 'assess' the State's 'compliance' with the NVRA's and HAVA's list-maintenance requirements." *Benson III*, 187 F.4th at 466 (Murphy, J., concurring); *see also id.* at 474-475 (Griffin, J., dissenting); *id.* at 480 (Thapar, J., dissenting). Because the demand here is substantively analogous to the one in *Benson III*, this Court should conclude the same.

**1. Courts play a limited role in assessing the Attorney General's demand under Title III.**

a. Courts undertake a limited role in evaluating a Section 303 demand. The Attorney General's authority under Title III is "purely investigative," *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and the "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By invoking the court's jurisdiction to obtain records required to be maintained under Section 301, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*,

306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [Section 303] written demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703). Accordingly, a state official responding to the Attorney General's demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers the records essential." *Ibid.* Nor is "the factual foundation for, or the sufficiency of," this statement "open to judicial review or ascertainment." *Ibid.*; *see*

*United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*). The United States need not "allege specific details" underlying its demand, *Lynd I*, 301 F.2d at 822, but need only "identify in a general way the reasons for his demand," such as that it "was made for the purpose of investigating *possible* violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (emphasis added; citation omitted). "No showing even of a prima facie case of a violation of Federal law need be made." *Coleman*, 313 F.2d at 868 (citation omitted). And Title III does not specify that "the basis" must be a factual one, as opposed to a legal one. *See* 52 U.S.C. 20703.

The Fifth Circuit's approach to Title III's "summary proceeding[s]," *Lynd II*, 306 F.2d at 226, is consistent with subsequent Supreme Court precedent. In *Donaldson v. United States*, the Supreme Court observed that, although the Rules of Civil Procedure "have an application to a summons proceeding," they "are not inflexible in this application," and, moreover, precedent does not suggest those rules should be used to "impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. 517, 528-529 (1971), *superseded by statute on*

*other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520; *see Lynd II*, 306 F.2d at 226 (allowing judicial determination of whether "written demand has been made" and whether the custodian "ha[s] been given reasonable notice of the . . . proceeding").[8]

Title III's summary nature also illustrates "[t]he restricted substantive nature of the proceeding." *Lynd II*, 306 F.2d at 227. "[N]othing in Title III gives courts a judicially manageable standard to apply in reviewing the demand's format." *Benson III*, 187 F.4th at 480 (Thapar, J., dissenting). Accordingly, the only "matters open for determination" by the court when a recipient challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable

[8] *Donaldson* also shows why the district court's reliance on *United States v. Powell*, 379 U.S. 48 (1964), is misplaced. *See* SA5-6. The *Donaldson* Court explained that *Powell* should not impair summary enforcement proceedings that otherwise protect defendants' rights. *Donaldson*, 400 U.S. at 529. And *Powell* dealt with an IRS summons, which "is meaningfully different from a Title III demand" because it (1) "is directed at a private party with constitutional rights, rather than a state official; (2) can demand a much more "intrusive" scope of records; and (3) "is self-executing" and "triggers criminal contempt liability," whereas a Title III demand does not. *Benson III*, 187 F.4th at 480 (Thapar, J., dissenting).

notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. Additionally, "[i]f, *after issuance of an order to produce*, a genuine dispute subsequently arises as to whether or not any specified particular paper or record comes within this broad statutory classification," that too may be addressed by the court. *Ibid.* (emphasis added).

b. Intervenors attempt to evade the special statutory proceeding contemplated in Title III by analogizing this proceeding to an administrative subpoena enforcement. *See, e.g.*, Doc. 68, at 15 (analogizing CRA demands to similar administrative subpoena processes). But the distinctions between a Title III demand and an administrative subpoena are pervasive and dispositive.

To start, the text of Title III is markedly different from the text of statutes relating to administrative subpoenas. The Attorney General's authority to demand records and papers under Title III extends only to a specific, though broad, set of documents: those "relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. 20701.

The authorization for administrative subpoenas is quite the opposite: the government to demand a wide variety of records and

testimony from any person but, because there is no other limit on the person affected or the type of information, the information must be relevant or material to one of the agency's authorized purposes. *See United States v. Powell*, 379 U.S. 48, 53 n.12 (1964) (noting that information can be obtained if it "may be relevant or material" (quoting 26 U.S.C. 7602 (1954 ed.))); *see also Khan v. United States*, 548 F.3d 549, 554 (7th Cir. 2008); *United States v. Insurance Consultants of Knox, Inc.*, 187 F.3d 755, 759 (7th Cir. 1999); *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1267 (7th Cir. 1982).

Consider the statute at issue in *Powell*, on which the district court relied (SA5-6). That statute authorizes the Internal Revenue Service (IRS) to issue an administrative summons to a taxpayer to appear and provide testimony and records that "may be relevant or material" to its inquiry into the taxpayer's liability due to a possibly fraudulent return. *Powell*, 379 U.S. at 53 n.12 (quoting 26 U.S.C. 7602 (1954 ed.)). The statute limits the IRS's authority to summon for:

> the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability.

26 U.S.C. 7602(a) (1954 ed.). The statute also requires the time and place of examination to be "reasonable under the circumstances." 26 U.S.C. 7605(a). Importantly, it also provides that "[n]o taxpayer shall be subjected to unnecessary examination or investigations." 26 U.S.C. 7605(b). So under that statute, courts have held that the issuer "must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed." *Powell*, 379 U.S. at 57-58.

The requirements that courts have imposed on enforcement of administrative subpoenas also have roots in the Fourth Amendment. *See, e.g.*, *Big Ridge, Inc. v. Federal Mine Safety and Health Rev. Comm'n*, 715 F.3d 631, 646 (7th Cir. 2013) (explaining that an administrative subpoena complies with the Fourth Amendment if "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."(citations omitted)); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-209 (1946) (discussing how the requirements of relevance, a congressionally authorized purpose

within Congress's power, and adequate specification of the documents satisfy the Fourth Amendment). But those Fourth Amendment concerns are not implicated in the context of Title III, where the federal government merely requests state documents from state officials—not an individual's private papers.

Title III already imposes the constraints that Congress deemed necessary by limiting the set of records and papers which he can demand. *See* 52 U.S.C. 20701, 20703. Title III already prescribes what method of production is reasonable under the circumstances. 52 U.S.C. 20703. And unlike administrative-subpoena statutes, Section 303 does not limit the purpose of any demand; a statement of purpose must simply be provided in the demand. 52 U.S.C. 20703; Part I.B.3, *infra*. Thus, there is no need and no statutory authorization for a relevance inquiry. Indeed, the CRA was enacted after Congress saw that the mere power of subpoena had not proven sufficiently effective in investigating discriminatory voting practices. *See Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . .

rather than for the issuance of a subp[o]ena").

c. But even under more generally applicable standards for enforcing administrative subpoenas, judicial review is "narrowly limited." *Walsh v. Alight Sols. LLC*, 44 F.4th 716, 722 (7th Cir. 2022). "It is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."[9] *Dow Chem. Co.*, 672 F.2d at 1266-1267 (citation omitted). The government "need not show that the exercise of its jurisdiction is supported by reasonable cause unless the person to whom the subpoena is directed raises a substantial question that the court's process will be abused by enforcement." *Powell*, 379 U. S. at 51. The government may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

[9] In the subpoena context, once these requirements are met, the defendant can only defeat a subpoena by disproving one of these criteria or proving that compliance would "impose an unreasonable or undue burden" or that the subpoena was "issued for an illegitimate purpose." *Walsh*, 44 F.4th at 722. Defendants cannot make such a showing. *See* pp. 41-45, *infra*.

The written demand satisfies all these requirements. The Attorney General's demand cites the DOJ's enforcement authorities under the NVRA and HAVA. Doc. 5-2, at 2, 7-9. Even putting aside that this is a legitimate purpose for such a written demand, *see* Part I.B.3, *infra*, it is enough that the government demand evidence that is "not plainly incompetent or irrelevant to any lawful purpose of the [agency] in the discharge of [its] duties." *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 701 (7th Cir. 2002) (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)). There is nothing indefinite about the demand, which seeks a specific document that Director Matthews is the custodian of. And the information sought (the SVRL) is reasonably relevant to the DOJ's investigation into whether the State of Illinois has maintained and updated its SVRL in compliance with federal law.

Disputes as to whether the records sought by the agency will ultimately prove a legal violation are not a basis for resisting the subpoena. *See Endicott Johnson Corp.*, 317 U.S. at 509; *see also EEOC v. South Carolina Nat'l Bank*, 562 F.2d 329, 332 (4th Cir. 1977) ("The administrative agency, not the court, is responsible for determining in the first instance through its preliminary investigations the coverage of

the statutes the agency must administer.”). The government need not know (let alone prove) on the front-end that its investigation will indeed uncover wrongdoing. *Morton Salt*, 338 U.S. at 642-643; *accord Link v. NLRB*, 330 F.2d 437, 440 (4th Cir. 1964) (“It is unreasonable to the extreme to insist that the result shall be in hand before an investigation may begin.”).

**2. The DOJ’s demand stated an adequate basis.**

Regardless of the level of scrutiny that applies, the Attorney General stated a sufficient basis for the demand. The two letters sent by the DOJ both individually and together provided ample “basis” for the demand.

a. As an initial matter, the district court erred in refusing consider the July 28 letter in its analysis. SA10 n.4. According to the district court, “each statement”—*i.e.*, both the basis and the purpose—“must be included within the written demand.” *Ibid.* But the district court provided no justification for construing the “written demand” to contain nothing beyond the August 14 letter. “[T]he Attorney General needn’t articulate a basis and a purpose in a single communication.” *Benson II*, 179 F.4th at 488 (Nalbandian, J., dissenting); *Benson III*, 187 F.4th at

474 (Griffin, J., dissenting); *id.* at 479 (Thapar, J., dissenting). "Title III refers to retention and preservation obligations 'upon demand . . . by the Attorney General'—not "*a* demand." *Benson II*, 179 F.4th at 488 (Nalbandian, J., dissenting). Both the July 28 and August 14 letters were part of an ongoing correspondence between the DOJ and Director Matthews. *See* Doc. 5-2, at 7 (DOJ referring to receipt of the redacted SVRL, which was a direct response to the July 28 letter); Doc. 5-2, at 14 (counsel for the Board responding to the August 14 letter and noting the Board's ongoing efforts to answer the "original July 28, 2025 letter").

The August 14 letter reiterated that the DOJ sought to "assess [the State's] compliance with the statewide VRL maintenance provisions of the [NVRA], 52 U.S.C. § 20501, *et seq*." Doc. 5-2, at 7. The August 14 letter also expanded upon the *legal* basis for the request, reciting in detail the relevant provisions of the CRA and clarifying that the SVRL demand was made not only under the Attorney General's HAVA and NVRA authority, but pursuant to the Section 303 of the CRA. SA4.

The letters worked together to provide Director Matthews the relevant "notice" to which she was entitled. *Benson II*, 179 F.4th at 488

(Nalbandian, J., dissenting). Ignoring one half of the demand "shuns . . . common[ ]sense." *Ibid.*

b. Title III does not require a "factual basis" as opposed to a legal one—which the August 14 letter undoubtedly contained (SA11-12). *See* 52 U.S.C. 20703. First, nothing in that text confines "the basis" to a factual predicate as opposed to a legal one—a State's list-maintenance obligations under the NVRA and HAVA are as much a "basis" for inquiry as any fact could be. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 641 (1992) (citation omitted) (holding that there was "no statutory basis" for a debtor's attempt to shield lawsuit proceeds from creditors); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 389 (2024) (citation omitted) (describing its review of National Labor Relation Board conduct as limited to assessing whether its determination had a "reasonable basis in law"); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (noting that a frivolous complaint could lack an "arguable basis" either in "law or in fact").

Consistent with that reading, courts have held that the Attorney General need only "identify in a general way the reasons for his demand," *Coleman*, 313 F.2d at 868, and that "[n]o showing even of a prima facie

case of a violation of Federal law need be made," *ibid*. There is likewise "no justification" for requiring the United States to "allege specific details" underlying its demand. *Lynd I*, 301 F.2d at 822.

The July 28 letter disclosed the factual discrepancies that alarmed the DOJ. Doc. 5-2, at 2-4. The August 14 letter discussed that the DOJ's request was "to assess [Illinois's] compliance with the statewide VRL maintenance provisions of the [NVRA]." Doc. 5-2, at 7. That letter also asserted the Attorney General's enforcement authority of HAVA and the NVRA, which the DOJ sought to further through the CRA. Doc. 5-2, at 7-9.

Under any reasonable reading, the basis and purpose for the DOJ's demand was clear and put Director Matthews on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. That was all that Director Matthews was owed. The demand provided sufficient notice of the basis for the demand, including the Attorney General's authority and reasons for desiring to inspect the SVRL, as well as the purpose.

c. But the July 28 letter, which must be read as part of the written demand, also contained ample factual basis for the Attorney General's demand. The DOJ cited EAVS data that was far outside the national

average in multiple categories. Doc. 5-2, at 2-4; *see* pp. 10-11, *supra*. As just one example, "sixteen counties in Illinois reported that the number of confirmation notices they sent was more than one hundred percent of all registered voters." Doc. 5-2, at 3. For another, "eighteen counties reported more than a quarter of voters listed as being removed were removed for a reason described as 'other.'" Doc. 5-2, at 4. This communication, which describes "factual concerns with [the State's] voter-registration list" is more than sufficient. *Benson III*, 187 F.4th at 466 (Murphy, J., concurring); *see also id.* at 474-475 (Griffin, J., dissenting); *id.* at 480 (Thapar, J., dissenting).

**3. The DOJ's stated purpose of ascertaining Illinois's compliance with the NVRA and HAVA was sufficient.**

The district court also erred in holding that the demand "must relate to a purpose of investigating violations of individuals' voting rights" and that NVRA and HAVA enforcement is not so related. SA8 (quoting *United States v. Oregon*, 828 F. Supp. 3d 1092, 1105 (D. Or. 2026), *appeal pending*, No. 26-1231 (9th Cir. argued May 19, 2026)).

a. Title III does not limit the permissible "purposes" for an investigation under the statute.

Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness*, 572 U.S. at 553, with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross*, 557 U.S. at 175 (citation omitted). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (alteration in original; citation omitted).

Here, the plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. *See* 52 U.S.C. 20701-20706; *Benson III*, 187 F.4th at 467 (Murphy, J., concurring) ("Although § 20703 requires the DOJ to identify the 'purpose' for its demand, I see nothing in the statute's text that limits the purposes for which the DOJ may request the records."). Congress made clear in other titles included in the CRA when it intended a remedy to be limited to particular harms—namely, racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The lack of a

similar limitation in Title III is significant, because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (brackets in original; citation omitted). And stating the demand's purpose would be a useless exercise if only one permissible purpose existed.

b. Even if Title III were limited to "investigating violations of individuals' voting rights" (SA8) (citation omitted), that requirement has been met here.

Ensuring Illinois's compliance with the NVRA and HAVA relates to individual voting rights and thus is a proper purpose for the Attorney General's Title III demand for federal election records under the district court's theory. By broadly authorizing the Attorney General to demand election records from States, the CRA is "one of the federal government's most important tools to inspect states' election records, ensure they comply with federal law, and thus protect the integrity of our elections." *Benson III*, 187 F.4th at 477 (Thapar, J., dissenting).

Congress passed the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3). And HAVA, for its part, is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[10]

Moreover, the Supreme Court has recognized that fraudulent votes—which can be minimized through the NVRA's and HAVA's procedures—can "dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647,

[10] U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf (last visited Sept. 22, 2026).

672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). Because both the NVRA and HAVA are federal election laws that protect voting rights, "the DOJ may use the CRA to investigate possible violations of" either statute. *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich.), *aff'd*, 179 F.4th 470, *reh'g en banc denied*, 187 F.4th 462 (6th Cir. 2026).

#### 4. Mere allegations of purported improper purposes do not eliminate the United States' entitlement to records under Section 303.

Defendants also argued that the DOJ's demand was improper because it was "pretextual" or "contrived." Doc. 43, at 3, 14. As already explained (pp. 32-42, *supra*), this Court's review of the DOJ's demand is limited to assessing whether the Attorney General in fact stated a "basis and purpose," 52 U.S.C. 20703, not whether that basis and purpose is subjectively sufficient. *See, e.g.*, *United States v. American Target Advert., Inc.*, 257 F.3d 348, 354 (4th Cir. 2001) ("Congress has duly weighed the competing policy interests, and it has chosen in favor of the

effective administration and enforcement of its laws. It is not the role of the courts to second-guess that choice."); *see also Dow Chem. Co.*, 672 F.2d at 1267.

Setting that aside, even under precedents involving administrative subpoenas, the burden on a party resisting a subpoena based on claims that the government is abusing the court's process and acting in "bad faith" "is a heavy one." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978). The United States generally "need only demonstrate good faith in issuing the summons." *United States v. Stuart*, 489 U.S. 353, 359 (1989). The types of improper purposes that justify court intervention are narrow "such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58.

Neither intervenors nor defendants here can overcome their heavy burden of disproving the good faith basis of the demand and proving the demand was issued out of malice, intent to harass, to pressure Director Matthews to settle a collateral dispute, or the like. *See* Doc. 68, at 16-17 (stating that, because DOJ's purpose is a pretextual shield for alleged immigration enforcement, "the United States has not honestly disclosed

its purpose" so it cannot invoke the NVRA, HAVA, or the CRA). Under precedents involving administrative subpoenas, this Court has acknowledged that a party resisting a subpoena based on claims of "bad faith" "faces a 'heavy burden.'" *Insurance Consultants of Knox, Inc.*, 187 F.3d at 759 (citation omitted). The party must "alleg[e] 'specific facts' in rebuttal." *Ibid.* (citation omitted); *see also* Doc. 49, at 10; Doc. 66, at 4.[11]

Defendants point to a letter sent from the former Attorney General Pam Bondi to the Governor of Minnesota addressing a variety of issues, from immigration to voting to SNAP benefits. Doc. 43, at 5-6. They also cite to third-party characterizations of news organizations. Doc. 43, at 4-5. This does not satisfy defendants' "heavy burden" to "alleg[e] 'specific facts,'" not just cast aspersions. *Insurance Consultants of Knox, Inc.*, 187 F.3d at 759.

## II. The DOJ's demand for Illinois's unredacted SVRL does not implicate or violate state or federal privacy laws.

The district court did not reach defendants' or intervenors' arguments regarding state or federal privacy laws, but these arguments

[11] Defendants' cited news articles, which rely on speculation and inadmissible hearsay, do not satisfy the requirements for judicial notice. Fed. R. Evid. 201(b).

are meritless. *See, e.g.*, Doc. 43, at 8-12; Doc. 56, at 14-20. Illinois's duty to comply with Title III is independent of any duty the United States has to comply with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896; *see United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an IRS summons"). Regardless, the United States is complying with federal privacy laws.

### A. Federal law preempts any contrary Illinois privacy law.

Director Matthews argued below that DOJ's demand for Illinois's unredacted voter list would violate federal privacy statutes. Doc. 43, at 8-12. To be sure, Director Matthews did not argue that specific state laws preempt compliance but instead has implied that Illinois laws are also entwined in this issue. Doc. 43, at 11 (citing 10 Ill. Comp. Stat. Ann. 5/1A-16.1 & 16.7 (West 2025)). Put simply, state law does not allow Illinois to defy federal law. To the extent that state law purports to prohibit Illinois from complying with the United States' demands, state law must yield. *See* U.S. Const. Art. VI, Cl. 1; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed

subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

Notwithstanding a State's broad constitutional authority over the conduct of federal elections, including voters' privacy rights, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ibid.* (brackets in original) (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)).

Congress enacted broad regulations over the conduct of federal elections. Title III imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962)

(*Lynd II*). Title III authorizes the Attorney General to compel records under Title III but imposes its own privacy protections for records and papers demanded under Section 303. *See* 52 U.S.C. 20704. If Illinois's laws impose even greater privacy protections, they conflict with and thwart the enforcement of federal law and therefore are preempted. *See, e.g.*, *Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) ("It is a bedrock rule, of course, that federal law preempts state law when the two conflict.").

Nor does the text or history of Title III support Director Matthews's position. Indeed, even in the 1960s, voter-registration applications—unquestionably records covered by the CRA, *see* 52 U.S.C. 20701—sometimes contained significant personal information that the defendants seek to shield here, such as birthdates. *See, e.g.*, *United States v. Duke*, 332 F.2d 759, 761, 768 (5th Cir. 1964) (good moral character, literacy); *United States v. Mississippi*, 229 F. Supp. 925, 995 & nn.92-93 (S.D. Miss. 1964) (Brown, J., dissenting) (birthdate, good moral character, address, length of residency), *rev'd*, 380 U.S. 128 (1965); *Gray v. Main*, 309 F. Supp. 207, 219 (M.D. Ala. 1968) (birthdate).

Analogizing the CRA to the NVRA, defendants have argued that nothing in the CRA prohibits Illinois from redacting sensitive information in the SVRL prior to producing it for inspection. Doc. 65, at 17. But there is a glaring distinction between inspection under the NVRA and inspection under the CRA; namely, that the NVRA contains a *public* inspection provision. Courts have interpreted the NVRA to not require releasing voters' unredacted personal information to the public at large. *See Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases). But under the CRA, only the Attorney General and his representatives may inspect covered records. *See* 52 U.S.C. 20703, 20704. The production of information (including *federal* social security numbers) to the United States does not raise the same concerns as arise in the NVRA context.

The purpose of the CRA—to allow the Attorney General access to the information necessary to determine whether there is a violation of federal law—would be entirely thwarted by allowing States to redact identifying information from voting records. There is every reason to think that Congress fully intended the Attorney General to have access to complete voter lists with identifying information to be able to

determine whether applicants have, in fact, been registered to vote. *See generally United States v. Benson*, 187 F.4th 462, 480-481 (6th Cir. 2026) (Thapar, J., dissenting from the denial of reh'g en banc). To the extent state law would prohibit Illinois from fully complying with the DOJ's demands, and providing an unredacted SVRL, state law must yield.

### B. The United States is complying with the Privacy Act.

While not specifically addressed below, defendants argued the DOJ violated the Privacy Act. Doc. 43, at 9-10. Director Matthews relied on a provision of the Privacy Act that prohibits federal agencies from "maintain[ing] [any] record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7); *see* Doc. 43, at 10. Enforcing the CRA, the NVRA, and HAVA is such law enforcement activity. *See* 52 U.S.C. 20702, 20510(a), 21111. The United States nonetheless agrees not to object to redaction of information—like party affiliation and how an individual has voted—that both describes First Amendment activity and is not pertinent to the Department's investigation.

Part of DOJ's obligations under the Privacy Act also include appropriate identification and use of a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), that covers an unredacted SVRL. DOJ has complied with the Privacy Act and the identification of an applicable SORN and any allegation to the contrary is incorrect.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). It requires federal agencies to "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. 552a(e)(4).

The DOJ did so here. It has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept

. . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[12]

The SORN's "categories of individuals on whom records are maintained in the system," 5 U.S.C. 552a(e)(4)(B), includes all registered voters in Illinois and in other states. The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted),

[12] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited September 28, 2026).

which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual §9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance and voter fraud. Moreover, because votes case by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611. The Privacy Act therefore provides no alternative basis to affirm the district court.

### C. The E-Government Act does not prevent the DOJ from obtaining Illinois's SVRL.

Defendants also argue that because the United States has not conducted a privacy impact assessment (PIA), the United States has not complied with the E-Government Act. Doc. 43, at 10-11. Pursuant to the E-Government Act, agencies must "conduct a [PIA]" before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical reporting requirements

imposed on, 10 or more persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)(ii) and (B)(i), 116 Stat. 2899, 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without reference to the Statutes at Large or the U.S. Code note). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with the Department of Justice's demand for Illinois's (or any State's) SVRL. *See* E-Government Act § 208(b)(1)(A)(ii)(II); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals to

keep records or file reports regarding certain financial relationships or transactions with foreign agencies).

Second, a "collection of information" does not include information collected during an investigation like the type the Department is carrying out here. "[T]he term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And 44 U.S.C. 3518(c)(1)(B), in turn, generally excludes any collection of information "during the conduct of" an "investigation involving an agency against specific individuals or entities." The Department's investigation into Illinois's compliance with HAVA and the NVRA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C., at 33 (2026), https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr. (EPIC) v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95

(D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502, 3601. Accordingly, courts give these terms their "ordinary meaning" and may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see also Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002).

The demand in this case did not begin any new collection of information. The Attorney General demanded that Director Matthews provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL has been required to "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking

information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added).

### D. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining Illinois's SVRL.

Contrary to defendants' arguments (Doc. 43, at 11), the United States' demand also complied with the Driver's Privacy Protection Act of 1994 (DPPA), 18 U.S.C. 2721 *et seq.*; *see* 18 U.S.C. 2721(a) and (c); Doc. 58-1, at 39-40. Although the DPPA generally prohibits the disclosure of "personal information" obtained by a state department of motor vehicles in connection with a motor-vehicle record, 18 U.S.C. 2721(a) and (c); *see* 18 U.S.C. 2725(1) and (3)-(4), disclosure is allowed "[f]or use by any government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. 18 U.S.C. 2721(b)(1); *see also Reno v. Condon*, 528 U.S. 141, 145 & n.1 (2000) ("The DPPA *permits* DMVs to disclose personal information from motor vehicle records for a number of purposes," including "for use 'by any

government agency . . . in carrying out its functions.'") (quoting 18 U.S.C. 2721(b)(1) (1994 ed. and Supp. III)).

The United States' demand for an electronic, unredacted copy of Illinois's SVRL falls squarely within this exception. The Department is a "government agency . . . carrying out [one of] its functions," 18 U.S.C. 2721(b)(1), namely, assessing and ensuring compliance with federal election statutes. *See* 52 U.S.C. 20510(a) (authority to enforce the NVRA); 52 U.S.C. 21111 (authority to enforce HAVA). In particular, the Department of Justice is verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in Section 2721(b)(1), the United States' use of and access to the SVRL is authorized even though some of the information originates from a motor-vehicle record.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order dismissing the DOJ's Title III claim and denying the Motion to Compel, and remand with instructions to order Director Matthews to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to

demand from a State an electronic, unredacted copy of its SVRL to determine the State's compliance with the NVRA and HAVA.

Further, because the DOJ is entitled to "prompt and expeditious inspection" of voting records under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b).

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. P. 2, 40(d)(1).

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

s/ Kelsey E. McGee
ANDREW G. BRANIFF
DAVID N. GOLDMAN
KELSEY E. MCGEE
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 251-0053

## STATEMENT REGARDING ORAL ARGUMENT

The United States is willing to waive oral argument, despite the great importance of the issues here, to allow faster resolution of this case. Of course, the United States will participate in oral argument, if the Court believes that the benefit of oral argument would outweigh the time concerns.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(1)(7)(B)(i) and 7th Cir. R. 32 because the brief contains 13,256 words, excluding the parts exempted by Federal Rules of Appellate Procedure 32(f) and 7th Cir. R. 32. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Kelsey E. McGee
KELSEY E. McGEE
Attorney

Date: September 28, 2026

## CERTIFICATE OF SERVICE

I certify that on September 28, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Kelsey E. McGee
KELSEY E. MCGEE
Attorney

# SHORT APPENDIX

## TABLE OF CONTENTS

Seventh Circuit Rule 30(d) Statement

District Court Opinion,
filed July 31, 2026 (Doc. 101) .......... SA1

Judgment in a Civil Case,
filed August 4, 2026 (Doc. 102) .......... SA15

Notice of Appeal,
filed August 17, 2026 (Doc. 104) .......... SA16

**SEVENTH CIRCUIT RULE 30(d) STATEMENT**

This Short Appendix contains all the materials required by Seventh Circuit Rule 30(a) and (b).

s/ Kelsey E. McGee
KELSEY E. MCGEE
Attorney

Date: September 28, 2026

E-FILED
Friday, 31 July, 2026 05:06:35 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA, Plaintiff,** | ) | |
| **v.** | ) | **Case No. 25-cv-3398** |
| **BERNADETTE MATTHEWS, in her official capacity as Executive Director of the State Board of Elections for the State of Illinois, Defendant.** | ) | |

**OPINION**

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff, United States of America, by and through the Attorney General, asks this Court to order Defendant Bernadette Matthews, as the Executive Director of the Illinois State Board of Elections, to produce federal voter records pursuant to Title III of the Civil Rights Act of 1960 ("Title III" and "CRA"). (Doc. 5). Matthews and the Intervenor Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) because the United States lacks authority under Title III to demand the voter registration list from the State of Illinois. (Docs. 41, 49, 56, 64, 67). For the following reasons, the United States' Motion to Compel is DENIED and Defendants' Motions to Dismiss are GRANTED.

## I. LEGAL BACKGROUND

The U.S. Constitution empowers states in the first instance to regulate and administer elections. U.S. Const. art. I, § 4, cl. 1; *see also Ass'n of Cmty. Orgs. for Reform Now*

*v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995). Although Congress may legislate to preempt state legislative choices as to elections, its preemptory authority may go only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

Indeed, "Congress has erected a complex superstructure of federal regulation atop state voter-registration systems." *Id.* at 5. The National Voter Registration Act of 1993 ("NVRA") "requires states to provide simplified systems for registering to vote in federal elections." *Id.* (emphasis omitted) (quoting *Young v. Fordice*, 520 U.S. 273, 275 (1997)). The NVRA "has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018) (citing 52 U.S.C. § 20501(b)). Each state is charged with "the administration of voter registration for elections for Federal office," including the handling and maintaining of voter registration lists. 52 U.S.C. § 20507(a)–(g).

Congress later enacted the Help America Vote Act of 2002 ("HAVA") to "establish minimum election administration standards for federal elections" whereby states were required to "standardize voting systems, maintain computerized voter registration lists, and more." *Wis. Voter All. v. Millis*, 166 F.4th 627, 630 (7th Cir. 2026) (per curiam) (quotation omitted). HAVA requires "each State, acting through the chief State election official, [to] implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration

information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). The method of compliance with HAVA was left to the discretion of each State. *Id.* § 21085.

Decades earlier, Congress enacted the Civil Rights Act of 1960 to combat racial discrimination in voting. *S.C. v. Katzenbach*, 383 U.S. 301, 313 (1966). Title III of the CRA "gave the Attorney General access to local voting records" to aid in his enforcement of voting rights statutes. *Id.* For the immediate twenty-two months following a federal election, the election official is required by Title III to "retain and preserve . . . all records and papers which *come into his possession* relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701 (emphasis added). The Attorney General may "demand in writing" from the election official any "record or paper" required to be "retained and preserved," but the demand "shall contain a statement of the *basis and the purpose* therefor." *Id.* § 20703 (emphasis added). If a dispute arises, the district court sitting in the district where the demand is made "shall have jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705.

## II. FACTUAL BACKGROUND

On July 28, 2025, the U.S. Attorney General sent a letter to Matthews requesting, among other things, "[t]he current electronic copy of the State of Illinois' computerized statewide voter registration list." (Doc. 5-2 at Ex. 1). On August 11, 2025, Matthews provided the Attorney General with an electronic redacted copy of the list that omitted

the following sensitive information: dates of birth, driver's license and/or state identification numbers, and the last four digits of each registrant's social security number (collectively, "Sensitive Voter Information"). (Doc. 65-1; Doc. 4 at ¶¶ 22–24).

On August 14, 2025, the Attorney General sent a demand letter to Matthews stating: "Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Illinois's complete and current [Voter Registration List]. The purpose of the request is to ascertain Illinois's compliance with the list maintenance requirements of the NVRA and HAVA." (Doc. 5-2; Doc. 4 at ¶¶ 23, 25). Citing privacy laws, Matthews refused to provide the Attorney General with an unredacted copy of the list. (Doc. 4 at ¶¶ 23, 25).

Matthews and the Intervenor Defendants[1] moved to dismiss the complaint arguing the Attorney General lacks authority under Title III to demand the unredacted voter registration list from Illinois. Amicus briefs in support of dismissal were submitted by the Democratic National Committee, Eighteen States and the District of Columbia, and former attorneys of the United States Department of Justice's Civil Rights Division.

As of July 30, 2026, the Department of Justice (the "DOJ") has initiated similar Title III suits against election officials in 30 other states and the District of Columbia, seeking their full, unredacted voter information.[2] Eighteen district courts have dismissed the

[1] The Intervenor Defendants are Illinois AFL-CIO, Illinois Alliance for Retired Americans, Illinois Federation of Teachers, Common Cause, Illinois Coalition for Immigrant and Refugee Rights, Brian Beals, Pablo Mendoza, and Alejandra L. Ibañez.
[2] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just., https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information (last updated July 30, 2026).

DOJ's suit and the Sixth Circuit recently affirmed the judgment of the District Court for the Western District of Michigan dismissing the suit. *See United States v. Benson*, No. 26-1225, 2026 WL 1815425 (6th Cir. June 24, 2026). As detailed further below, the Court finds Title III does not provide the Attorney General with the authority to compel production of the unredacted voter registration list, and the written demand was deficient as a matter of law.

**III. DISCUSSION**

**A. Standard of Review**

The parties dispute the appropriate standard of review. The United States argues the Federal Rules of Civil Procedure do not apply to actions under Title III because those actions are "summary proceedings" and "not the commencement of an ordinary, traditional civil action with all its trappings." (Doc. 73 at 6 (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962))). The United States contends that a district court may not inquire into the legal sufficiency of the written demand's basis or purpose, but only consider whether the Attorney General has, in fact, made a written demand for federal election records with the necessary basis and purpose and whether that demand was refused.

The Supreme Court in *United States v. Powell*, 379 U.S. 48 (1964), held that where a statute authorizes courts to compel compliance, but the statute "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Id.* at 57–58, 58 n.18. In *Powell*, the Supreme Court

applied the Federal Rules of Civil Procedure in considering whether Section 7604(a) of the Internal Revenue Code authorized the enforcement of the IRS Commissioner's summons "by appropriate process." *Id.* at 52, 57–58, 58 n.18. Here, Title III of the CRA also provides district courts with jurisdiction "by appropriate process" to compel the production of records and papers. 52 U.S.C. § 20705. Accordingly, the Court finds judicial review of Title III is governed by the Federal Rules of Civil Procedure. *Powell*, 379 U.S. at 58 ("It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused."); *see also Benson*, 2026 WL 1815425, at *8 n.2.

A motion to dismiss under Rule 12(b)(6) challenges whether a complaint has stated a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive dismissal, the claim on its face must demonstrate a plausible right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. In review, a district court need not accept a complaint's legal conclusions, *id.*, and may take judicial notice of matters of public record, *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997).

**B. Title III Does Not Authorize the Attorney General to Demand a Voter Registration List**

Under Title III of the CRA, the Attorney General is authorized to demand only those records held by an election official following an election that "come into his possession," and are "requisite to voting in such election." 52 U.S.C. §§ 20701, 20703.

"Come into possession" is a synonym for "obtain," "acquire," or "receive." *See Benson*, 2026 WL 1815425, at *4 (finding same); *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) (defining "obtain" to mean, among other things, "to come into the possession" of something (citing 10 Oxford English Dictionary 669 (2d ed. 1989))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting Webster's New International Dictionary (3d ed. 1966))). As used in Title III, the phrase does not encompass records that state election officials *create* or merely *possess*. *See Benson*, 2026 WL 1815425, at *5 ("An ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained.") Instead, the election officials are required to preserve records that come into their possession from outside sources.

Recall that HAVA requires "each State, acting through the chief State election official" to implement a statewide voter list. 52 U.S.C. § 21083(a)(1)(A). The list is created by the Illinois Board of Elections and maintained internally.[3] Although the Board possesses the list by its own creation, the Board did not *come into* its possession. If Congress had meant "come into possession" to simply mean any record existing within the election official's "possession," it would not have chosen to include the ostensibly

[3] The Board accepts information received from other state agencies—in addition to voters—and compiles that information into its voter registration list as required by federal and state law. 52 U.S.C. §§ 20504, 20506; 10 ILCS 5/1A-16.1–16.8; *see also United States v. Wisc. Elections Comm'n*, No. 25-cv-1036, 2026 WL 1430354, at *4 (W.D. Wis. May 21, 2026) ("[V]oter registration lists are not necessarily simple compilations of voter registration applications. Some contain additional information that Congress may very well have wanted to exempt from production.").

extraneous language. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (collecting cases and explaining that no statute should be read to make any word or clause "superfluous, void, or insignificant" (internal quotation marks omitted)); *Benson*, 2026 WL 1815425, at *6 ("A construction that makes all voting records and papers in the election officers' possession subject to Title III would render 'come into' superfluous."). Furthermore, Title III's plain text states that retained records must be "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The Sixth Circuit correctly identifies these terms as referring to those records obtained from voters or prospective voters—"[e]lection officers do not create these kinds of records." *Benson*, 2026 WL 1815425, at *5.

Requiring disclosure of records received rather than those created by state election officials is consistent with the CRA's congressional purpose. Congress was concerned with racial discrimination in voting when it passed the CRA. *See Katzenbach*, 383 U.S. at 313. Title III confers the Attorney General authority to review records that come into the state's possession with respect to a particular federal election to determine whether the state violated individuals' voting rights. 52 U.S.C. § 20701; *see United States v. Oregon*, No. 6:25-cv-1666, 2026 WL 318402, at *10 (D. Or. Feb. 5, 2026). In furtherance of the CRA's objectives, the federal election records received by the state—and "requisite to voting in such election"—are amenable to the federal government's review. 52 U.S.C. § 20701. Allowing the Attorney General to review everything the state itself generates serves as an expansive grant of authority and is one such grant that is not clear from the text of the

statute. *See Inter Tribal Council of Ariz.*, 570 U.S. at 9 (regulating federal elections is reserved to the states insofar as Congress chooses to exercise its preemptory authority); *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." (internal quotation marks omitted)).

Finally, NVRA and HAVA require election officials to maintain voter registration lists with "reasonable effort[s]" to ensure accuracy by removing "the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507 (NVRA); *id.* § 21083 (HAVA). The appropriate election official is tasked with performing list maintenance on a regular basis including altering the list. *Id.* § 21083. But under Title III, anyone who "willfully steals, destroys, conceals, mutilates, or alters any record or paper required . . . to be retained and preserved shall be fined . . . or imprisoned . . . ." *Id.* § 20702. Thus, interpreting Title III to require the preservation and disclosure of the voter registration list "would place elections officials in violation of one federal law for trying to comply with others," *Benson*, 2026 WL 1815425, at *6; *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018) ("Courts must 'interpret Congress's statutes as a harmonious whole rather than at war with one another').

Accordingly, the Court finds a voter registration list is not subject to the Attorney General's investigatory power under Title III.

**C. The August 14th Demand Letter Did Not State a Sufficient "Basis" or Legitimate "Purpose"**

Dismissal is additionally warranted because the Attorney General's written demand did not include both a sufficient basis and legitimate purpose for requesting the unredacted voter registration list. *See* 52 U.S.C. § 20703. The United States argues § 20703 requires the demand to include a statement of the basis *or* the purpose for the demand. However, the canons of statutory construction demand otherwise. 52 U.S.C. § 20703 (stating "demand shall contain a statement of the basis *and* the purpose therefor." (emphasis added)); *see also Loja v. Main St. Acquisition Corp.*, 906 F.3d 680, 683 (7th Cir. 2018) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 116 (2012))).

It is well established that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc.*, 534 U.S. at 31 (internal quotation marks omitted and collecting cases). This Court agrees with the Sixth Circuit and district courts who have considered the issue and, in accordance with principles of statutory construction, have required the Attorney General to state both a basis and purpose in his demand.[4] *Benson*, 2026 WL 1815425, at *8; *see, e.g.*, *United States v. Galvin*, No. 25-13816, 2026 WL 972129, at *5 (D. Mass. Apr. 9, 2026); *see also Walsh v. Alight Sols. LLC*, 44 F.4th 716, 722 (7th Cir. 2022) (an

[4] Given that the "demand shall *contain* a statement of the basis and the purpose," 52 U.S.C. § 20703 (emphasis added), each statement must be included within the written demand. Any ex ante or post hoc statement or rationalization of the basis or purpose, *see* Doc. 73 at 12 (arguing the earlier letter dated July 28th stated a basis); Doc. 73-1 (2d Declaration of Eric Neff), cannot suffice.

administrative subpoena "may not be issued for an illegitimate purpose" and "the information sought [must be] reasonably relevant" to an inquiry "within the authority of the agency").

**(1) "Basis"**

The United States contends the written demand complied with Title III's basis requirement by identifying the legal authority relied upon. (Doc. 5-2 ("Pursuant to the foregoing authorities, including the CRA . . . .")). But it stands to reason that the Attorney General must state more than a vague statutory reference or every Title III demand would have sufficient basis so long as the Attorney General includes some statutory authority. *See Galvin*, 2026 WL 972129, at *5 ("This argument confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand."); *Oregon*, 2026 WL 318402, at *9 ("[T]he statute underlying the investigation is nothing more than a component of the purpose.").

Instead, Title III requires a factual basis for the demand which could include the evidence behind the Attorney General's investigation into the state's suspected noncompliance with federal law. *See, e.g.*, *Galvin*, 2026 WL 972129, at *5 (collecting cases and reasoning that Congress could not have intended that the Attorney General need only "include a citation to Title III in demand letters"); *e.g.*, *Oregon*, 2026 WL 318402, at *8–9 ("The Court understands 'basis' to mean a factual basis for investigating a violation of a federal statute."); *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026)

("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). However, no determination on the contours can be made here because the August 14th Demand Letter did not provide any factual basis for this Court to review. The Court finds the Attorney General was statutorily required to explain the relevance of the Sensitive Voter Information to his inquiry. Because he failed to do so, the Attorney General's written demand was deficient on its face for want of a stated basis.

**(2) "Purpose"**

Although the August 14th Demand Letter contained an explicit statement of the purpose of the demand – "to ascertain Illinois's compliance with the list maintenance requirements of the NVRA and HAVA" – enforcement of the maintenance requirements is not a proper purpose for a records demand under Title III.

The Attorney General must state a *legitimate* purpose for any Title III demand, distinct from his basis, that entitles him to the records sought, and district courts must consider its sufficiency. *See Benson*, 2026 WL 1815425, at *8 (requiring "a statement of the basis and purpose" for the demand). If the Attorney General could simply justify his demand with a statement of any purpose whatsoever, the requirement that he specify his purpose (and his basis) would be pointless and it would provide him with unfettered authority to demand voting records. *See TRW Inc.*, 534 U.S. at 31 (collecting cases on statutory interpretation); *see also Oregon*, 2026 WL 318402, at *9.

In consideration of the context from which the CRA was enacted, *see Abramski v. United States*, 573 U.S. 169, 179 (2014), as well as the "language and design of the statute," *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988), a Title III purpose must relate to Congress's rationale behind granting the Attorney General investigatory authority over certain federal voting records. In essence, the demand "must relate to a purpose of investigating violations of individuals' voting rights," as that is what the Attorney General was tasked by Congress to investigate. *Oregon*, 2026 WL 318402, at *10; *Inter Tribal Council of Ariz.*, 570 U.S. at 9 (Congress may choose to preempt States' "responsibility for the mechanics of congressional elections," but only "so far as [preemption] is exercised, and no farther"). Congress did not confer a general auditing power to the DOJ over state election officials. *See West Virginia*, 597 U.S. at 721–23.

Therefore, the Attorney General's stated interest in investigating "Illinois's compliance with the list maintenance requirements of the NVRA and HAVA" is not a proper Title III purpose as it does not relate to any suspected violation of voting. The Attorney General's demand is deficient in both its stated basis and purpose and cannot be enforced against Matthews.

## IV. CONCLUSION

For the reasons discussed, Defendant Bernadette Matthews was not required to disclose the records at issue in this case. Accordingly, the United States' Motion to Compel (Doc. 5) is DENIED and Defendants' Motions to Dismiss (Docs. 41, 49, 56, 64, and 67) are GRANTED. Because the Court finds any further amendment to the complaint

would be futile, the action is DISMISSED with prejudice. The Clerk is directed to close this case and enter Judgment in accordance with this Opinion.

ENTER: July 31, 2026

s/Colleen R. Lawless
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE

E-FILED
Tuesday, 04 August, 2026 01:14:46 PM
Clerk, U.S. District Court, ILCD


# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case Number: 25-cv-3398** |
| | ) | |
| **Bernadette Matthews, in her official Capacity as Executive Director of the State Board of Elections for the State of Illinois,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT IN A CIVIL CASE

☐ **JURY VERDICT.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY THE COURT.** This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Plaintiff United States of America's motion to compel records is denied and Plaintiff's action against Defendant Bernadette Matthews is dismissed with prejudice.

**Dated: 8/4/2026**

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

E-FILED
Monday, 17 August, 2026 11:49:00 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BERNADETTE MATTHEWS, in her official capacity as as Executive Director of the State Board of Elections for the State of Illinois,<br><br>Defendant. | Case No. 3:25-cv-03398-CRL-DJQ |

**NOTICE OF APPEAL**

Plaintiff United States of America, by and through the Attorney General, appeals to the United States Court of Appeals for the Seventh Circuit from this Court's Order denying the United States' Motion to Compel and granting the Motions to Dismiss by Defendant Matthews, Intervenor-Defendants Common Cause et al., and Intervenor-Defendants Illinois Alliance for Retired Americans et al. (ECF 101) and judgment (ECF 102) entered in this action on July 31, 2026, and August 4, 2026, respectively.

Dated: August 17, 2026

Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC A. SELL
Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

ANDREW G. BRANIFF
Acting Chief, Appellate Section

*/s/ James Thomas Tucker*
JAMES THOMAS TUCKER
JOSEPH W. VOILAND
JAKE TYLER BACHAND
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Seventh Floor
Washington, D.C. 20530
Telephone: (202) 307-2767
Email: james.t.tucker@usdoj.gov

Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

Respectfully submitted,

*/s/ James Thomas Tucker*
James Thomas Tucker